IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | | |
|---|---|---|
| WILLIAM STONER, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | No. 5:15-CV-102 (CAR) |
| CHIQUITA A. FYE, M.D., | : | |
| NORMAN HOWARD FITZ- | : | |
| HENLEY, M.D., | : | |
| | : | |
| | : | |
| Defendants. | : | |
| | : | |

## ORDER ON DEFENDANTS MOTION TO EXCLUDE
## CERTAIN OPINIONS OF DR. SACHY

Defendant Norman Howard Fitz-Henley, M.D. filed a *Daubert* motion objecting to

Thomas Sachy, M.D.'s expert opinions. Dr. Sachy is one of Plaintiff's two experts. The

parties have filed briefs, and the Court conferred by telephone with the lawyers to

discuss legal issues and fact questions and gave them the opportunity to supplement the

record and to direct the Court to important evidence.[1] After carefully reviewing the

---

[1] Counsel for Dr. Fitz-Henley submitted a chronology of Plaintiff's medical history to supplement the record. Plaintiff responded, "To the extent that Dr. Fitz-Henley's chronology reflects dates of events and/or treatment, it is accurate and I have no objection. The corresponding summaries also appear to be accurate. However, should the court being relying on the summaries for findings of fact, I object that they are not comprehensive of all relevant facts." *See* Pl.'s Medical Chronology, [Doc. 52].

record, and reading Dr. Sachy's long deposition, and studying the law, the Court **GRANTS** Defendant's Motion to Exclude Certain Opinions of Dr. Sachy [Doc. 28].

## BACKGROUND

Plaintiff William Stoner sued Norman Howard Fitz-Henley, M.D. and other defendants for failing to provide proper medical care for his serious medical condition while incarcerated at Macon State Prison ("MSP"). Dr. Fitz-Henley served as a private physician at MSP. Specifically, Plaintiff has sued Dr. Fitz-Henley for deliberate indifference to serious medical needs under 42 U.S.C. §1983, for medical malpractice under Georgia law, and for punitive damages. Plaintiff complains that he suffered multiple injuries because Defendants failed to properly treat his benzodiazepine withdrawals, and as a result of this bad care, Plaintiff allegedly suffered severe and permanent injuries. The Court will first summarize some important facts and some of Plaintiff's key contentions.

Plaintiff was arrested for public intoxication and felony interference with law enforcement officers. He was .239 drunk and fought with and injured officers trying to arrest him.[2] Later, Plaintiff violated his probation terms by failing to complete a drug

___

[2] Pl.'s Medical Chronology, [Doc. 52] at p. 25-26.

treatment program. As a consequence, a state court judge revoked his probation and sentenced him to 60 days in prison.[3]

On February 11, 2013, Plaintiff reported to the Baldwin County Jail to begin his prison term and was transported to the Bleckley Probation and County Detention Center. After being assessed at the Detention Center, he was transferred to MSP that same day because his medical condition required the 24-hour nursing care available at MSP. He was taking Coumadin for blood clots to prevent Deep Vein Thrombosis.[4]

On February 12, Dr. Fitz-Henley and several nurses saw Plaintiff at MSP.[5] On February 13, Plaintiff's mother talked to Codefendant Dr. Chiquita A. Fye to explain Plaintiff's benzodiazepine withdrawal risk.[6]  Dr. Fye was the prison medical director and on duty that day, and although she reviewed Plaintiff's medical records, she did not see him.

At some time during the late evening of February 13th or the early morning of February 14th, Plaintiff suffered medical problems that rendered him unconscious on the morning of February 14th when prison officials found him on the floor in his cell. His complaint alleges that at that time he was unresponsive, incontinent, breathing rapidly,

---

[3] *Id.* at p. 31.
[4] Dr. Fitz-Henley Stmt. of Mat. Facts, [Doc. 27-2] at para. 1-2; *id.*, Ex. A at D52 [Doc. 27-3] at p. 16; *id.*, Ex. A at D40, [Doc. 27-3] at p. 18.
[5] Pl. Dep., [Doc. 33] at p. 61-64.
[6] Margaret Stoner's Dep., [Doc. 42-4] at p. 14-15.

and cyanotic. He was taken to Flint River Hospital for treatment and then later that day

transferred to the Medical Center of Central Georgia in Macon. Plaintiff claims that he

has suffered brain damage, memory loss, post-traumatic stress disorder, cognitive

decline, and has lost teeth because of Defendant's medical negligence and deliberate

indifference to his serious medical needs.

## LEGAL STANDARD

Federal Rule of Evidence 702 governs the admissibility of expert testimony, and it

states:

> A witness who is qualified as an expert by knowledge, skill, experience,
> training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will
> help the trier of fact to understand the evidence or to determine a fact in
> issue; (b) the testimony is based on sufficient facts or data; (c) the testimony
> is the product of reliable principles and methods; and (d) the expert has
> reliably applied the principles and methods to the facts of the case.[7]

Simply stated, under Rule 702, the trial court can admit relevant expert testimony only if

it finds that: (1) the expert is qualified to testify about the matters he intends to address;

(2) the methodology used by the expert to reach his conclusions is sufficiently reliable;

and (3) the expert's testimony will assist the trier of fact, through the application of

---

[7] Fed. R. Evid. 702.

scientific, technical, or specialized expertise, to understand the evidence or determine a fact in issue.[8]

As the Supreme Court explained in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*,[9] Rule 702 imposes a duty on trial courts to act as "gatekeepers" to ensure that speculative and unreliable opinions do not reach the jury.[10]   Acting as a gatekeeper, the trial court must make certain that expert witnesses employ in the courtroom the "same level of intellectual rigor that characterizes the practice of an expert in the relevant field."[11] The court's gatekeeping role is especially significant, since "the expert's opinion can be both powerful and quite misleading because of the difficulty in evaluating it."[12]

To fulfill its role, the trial court must determine whether the expert has the requisite qualifications to offer his or her opinions.[13]   The trial court must also "'conduct an exacting analysis' of the <u>foundations</u> of expert opinions to ensure they meet the standards for admissibility under Rule 702."[14]   Finally, the court must ensure the relevancy of expert testimony, meaning that it must determine whether the testimony

---

[8] *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1257 (11th Cir. 2002) (citing *Maiz v. Virani*, 253 F.3d 641, 664 (11th Cir. 2001)); *J & V Dev., Inc. v. Athens-Clarke Cnty.*, 387 F. Supp. 2d 1214, 1223 (M.D. Ga. 2005).

[9] 509 U.S. 579 (1993).

[10] *Id.* at 589, n.7; *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1237 (11th Cir. 2005).

[11] *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999); *see also Goebel v. Denver & Rio Grande W. R.R. Co.*, 346 F.3d 987, 992 (10th Cir. 2003).

[12] *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (quoting *Daubert*, 509 U.S. at 595) (internal quotations omitted).

[13] *Poulis-Minott v. Smith*, 388 F.3d 354, 359 (1st Cir. 2004); *see also Frazier*, 387 F.3d at 1260.

[14] *Frazier*, 387 F.3d at 1260 (quoting *McCorvey*, 298 F.3d at 1257) (emphasis in original).

will assist the trier of fact.[15]   In undertaking this analysis, the court must remember that the party offering the expert opinions has the burden of proof by a preponderance of the evidence.[16]

The court performs its gatekeeping role consistent with Rule 104(a), which commits preliminary evidentiary questions to the court's decision and which further empowers courts in answering these questions to rely on evidence without being constrained by the rules of evidence.[17]   In sum, in acting as a gatekeeper, the court must keep "unreliable and irrelevant information from the jury because of its inability to assist in factual determinations, its potential to create confusion, and its lack of probative value."[18] Although *Daubert* involved scientific experts, the Supreme Court has made it clear that the strictures of Rule 702 and *Daubert* apply with equal force to non-scientific expert witnesses.[19]   Also, in all cases the proponent of the expert witness bears the burden of establishing that the expert's testimony satisfies the qualification, reliability, and helpfulness requirements of Rule 702 and *Daubert*.[20]  Finally, "any step that renders

---

[15] *See Daubert*, 509 U.S. at 591.

[16]  *McClain v. Metabolife, Intern., Inc.*, 401 F.3d 1233, (11th Cir. 2005).

[17] *Id*. at 592-93 & n. 10; Fed. R. Evid. 104(a). In particular, Rule 104(a) provides that "[t]he court must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible. In so deciding, the court is not bound by evidence rules, except those on privilege." Fed. R. Evid. 104(a).

[18] *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1311-12 (11th Cir. 1999).

[19] *See Kumho Tire*, 526 U.S. at 147.

[20] *McClain*, 401 F.3d at 1238 & n. 2; *see also Frazier*, 387 F.3d at 1260.

the analysis unreliable renders the expert's testimony inadmissible."[21]

Beginning with the qualification requirement, the Eleventh Circuit has explained that "experts may be qualified in various ways."[22]   Certainly, an expert's scientific training or education may provide one means by which an expert may qualify to give certain testimony; however, experience in a particular field may also qualify an expert to offer an opinion on a particular matter.[23]   Indeed, "experts come in various shapes and sizes," and, consequently, "there is no mechanical checklist for measuring whether an expert is qualified to offer opinion evidence in a particular field."[24]   In all cases, the court must focus its inquiry on whether the expert has the requisite skill, experience, training, and education to offer the testimony he intends to introduce.[25]

Regarding the reliability requirement, the Eleventh Circuit directs trial courts to assess "whether the reasoning or methodology underlying the testimony is . . . valid and whether that reasoning or methodology properly can be applied to the facts in issue."[26]

---

[21] *Goebel*, 346 F.3d at 992 (quoting *Mitchell v. Gencorp, Inc.*, 165 F.3d 778, 782 (10th Cir. 1999)) (internal alterations omitted).
[22] *Frazier*, 387 F.3d at 1260.
[23] *Id.* at 1260-61.
[24] *Santos v. Posadas de Puerto Rico Assocs. Inc.*, 452 F.3d 59, 63 (1st Cir. 2006).
[25] *Poulis-Minott*, 388 F.3d at 359.
[26] *Frazier*, 387 F.3d at 1262 (quoting *Daubert*, 509 U.S. at 592-93) (internal alterations omitted).

This inquiry must focus "solely on the principles and methodology [of the experts], not on the conclusions that they generate."[27]

*Daubert* offers four non-exclusive factors that courts may consider in evaluating the reliability of an expert's testimony: (1) testability; (2) error rate; (3) peer review and publication; and (4) general acceptance.[28] These four factors most readily apply in cases involving scientific testimony and may offer little help in other cases, particularly those involving non-scientific experts.[29] Accordingly, these factors merely illustrate rather than exhaust the factors or tests available to the trial court. The trial court has "considerable leeway" in deciding which tests or factors to use to assess the reliability of an expert's methodology.[30]

The advisory committee's notes for Rule 702 offer an additional list of factors or tests. These tests are:

(1)     Whether the expert is proposing to testify about matters growing naturally and directly out of research he has conducted independent of the litigation, or whether he has developed his opinion expressly for purposes of testifying;

(2)     Whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion;

(3)     Whether the expert has adequately accounted for obvious alternative explanations;

---

[27]  *Daubert*, 509 U.S. at 595; *see also Goebel*, 346 F.3d at 992.

[28]  509 U.S. at 593-95; *see also J & V Dev., Inc.,* 387 F. Supp. 2d at 1224.

[29]  *See Kumho Tire*, 526 U.S. at 150-52.

[30]  *Id.* at 151-52.

(4)     Whether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting;

(5)     Whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give.[31]

Like the four *Daubert* factors, these factors do not comprise a definitive checklist, nor is any single factor dispositive of reliability; instead, the tests articulated in the advisory committee's notes merely illustrate the issues a court may consider in evaluating an expert's testimony.[32]

Finally, for admission, the expert testimony must assist the trier of fact.   Expert testimony assists the trier of fact "if it concerns matters that are beyond the understanding of the average lay person."[33]  "[E]xpert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments."[34]   Nor does expert testimony help the trier of fact if it fails to "fit" with the facts of the case.[35] Expert testimony lacks "fit" when "a large analytical leap must be made between the facts and the opinion."[36]   "A court may conclude that there is

---

[31] Fed. R. Evid. 702 advisory committee's note (2000 amendments).

[32] *See id.*

[33] *Frazier*, 387 F.3d at 1262.

[34]  *Id.* at 1262-63.

[35] *McDowell v. Brown*, 392 F.3d 1283, 1299 (11th Cir. 2004).

[36] *Id.*; *see also Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

simply too great an analytical gap between the data and the opinion proffered."[37]   Thus, the court may exclude otherwise reliable testimony if it does not have "sufficient bearing on the issue at hand to warrant a determination that it [is 'helpful' to the trier of fact]."[38] At all times when scrutinizing the reliability and relevance of expert testimony, a court must remain mindful of the delicate balance between its role as a gatekeeper and the jury's role as the ultimate fact-finder.   A district court's "gatekeeper role . . . is not intended to supplant the adversary system or the role of the jury."[39]   "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."[40]   A court may not "evaluate the credibility of opposing experts" or the "persuasiveness of competing scientific studies;"[41]  instead, its duty is limited to "ensur[ing] that the fact-finder weighs only sound and reliable evidence."[42]

## Part 1: ANALYSIS OF DR. SACHY'S OPINIONS

Dr. Thomas Sachy is a psychiatrist practicing in Gray, Georgia, a small town approximately 15 miles east of Macon. Dr. Sachy, however, does not have the typical

---

[37]  *General Electric*, 522 U.S. at 146.
[38]  *Bitler v. A.O. Smith Corp.*, 391 F.3d 1114, 1121 (10th Cir. 2004).
[39]  *Allison*, 184 F.3d at 1311.
[40]  *Daubert*, 509 U.S. at 596.
[41]  *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK, Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003).
[42]  *Frazier*, 387 F.3d at 1272.

psychiatric practice because he runs a pain clinic.   Seventy percent of his patients receive treatment for pain, and he prescribes large amounts of benzodiazepines, opiates, and other psychotropic drugs for many of his patients, including Plaintiff.[43]   Although Dr. Sachy is board-certified in psychiatry, he never did a pain management fellowship, so his only training comes from three continuing education seminars.[44]

Dr. Sachy started treating Plaintiff in 2007 and continued to treat him up to the time of Dr. Sachy's deposition for pain and psychiatric problems by prescribing multiple drugs. Consequently, Dr. Sachy is Plaintiff's treating physician; but Plaintiff's counsel has presented him to the Court as an expert witness, so the Court will treat his opinions accordingly. With that in mind, the record shows that Dr. Sachy has limited opinions in this case—limited in number and limited in the data and reliable methodology used to support those opinions. Furthermore, beyond the 702 failures, Plaintiff has also not satisfied the Fed. R. Civ. Proc. 26(c) report and notice requirements for expert witnesses, which is the second basis for excluding his opinions.

---

[43]  The Court note Plaintiff's expert Dr. Herrington testified in his deposition that the amount of drugs Dr. Sachy gave Plaintiff was "a significant dose", [Doc. 31] at p. 37, "generous to large", [Doc. 31] at p. 39, and stating when these two classes of medicine together "you have to be very vigilant and careful in your decision making" as "that is a lot," [Doc. 31] at p. 42, 43.   Further, the dosage of Xanax and oxycodone would concern Dr. Herrington because of the possibility of respiratory failure. [Doc. 31] at p. 41.   Indeed, Dr. Herrington doesn't treat patients with Xanax for anxiety or with any level of frequency. [Doc. 31] at p. 37 *See also* Pl. Medical Chronology, [52] at p. 29 (River Edge Behavioral Health describes Plaintiff as being on "large amount of Xanax & oxycodone, which he justifies by his pain and anxiety.").
[44]  *See* Dr. Sachy's Dep., [Doc. 34] at p. 55-56, 58-60, 64; *id.*, Ex. 3 [Doc. 34-4] at p. 6-13.

To outline his opinions, Dr. Sachy wrote Plaintiff's counsel a letter dated July 12, 2015,[45] supposedly summarizing his views about the doctors' care and the Plaintiff's injuries, and Plaintiff's counsel sent it to Defense counsel.   Plaintiff's counsel also provided a defective Rule 26(a) report to them.[46]   Dr. Sachy's opinions are both simple and vague, and the vagueness arises from that simplicity, which the Court can better characterize as inadequacy.   They are mostly overgeneralized and unfocused opinions.

First, Dr. Sachy contends in his letter that MSP "staff apparently withheld critical medications from William." [47]  Second, as a result of Defendants' withholding medications, Plaintiff had at least one major seizure during the night hours of February 13/14.   Third, and like the first opinion, "the seizure[s] William suffered is/are a direct result of the failure of medical personnel within the Georgia Department of corrections to authorize appropriate and adequate medical treatment for his physical and mental conditions ...."[48]  Fourth, these failures amount to careless and inhumane [medical] decisions that guaranteed he would suffer seizures.[49]  He also describes these failures as gross negligence, reckless indifference, medical malpractice, or some combination of

---

[45]  Ex. A to Memo. Of Law in Support of Mtn. to Exclude Dr. Sachy's July 12, 2015 Letter to D. Scott, [Doc. 28-2] at p. 1-2.

[46] Ex. C to Memo of Law in Support of Mtn. To Exclude, Pl.'s Rule 26 Expert Disclosure, [Doc. 28-4] at p. 1-3.

[47]  Dr. Sachy's July 12, 2015 Letter, [Doc. 28-2] at p. 1 (emphasis added).

[48]  *Id.*

[49]  *Id.*

these.[50]   Fifth, Dr. Sachy opines that a MRI performed on March 14, 2014, over a year after the incident at MSP, shows brain injury.[51]   Finally, Dr. Sachy describes all the medical, psychiatric, emotional and personal problems caused by Defendant's bad care at MSP.[52] But most of these medical problems are outside the scope of his medical specialty, practice, and training; and more important, he does not base his diagnoses on good data or a reliable methodology.

The Court can summarize his opinions in this way: because of Defendant's negligent care or deliberately indifferent care at MSP for his benzodiazepine withdrawals, Plaintiff suffered one or more seizures, and those seizures caused serious and permanent injuries. The Court, however, will not base its analysis on the faulty Rule 26 report or the conclusory letter, but rather on 240 pages of his deposition in which defense counsel deeply probed, thoroughly sifted, and ultimately exposed the failure of Dr. Sachy's expert opinions. In other words, because much of what Dr. Sachy said in his letter is not supported by testimony he gave under oath in his deposition, the Court will rely on his sworn testimony. And in examining the deposition, the Court is analyzing the

---

[50]  *Id.* at 2.
[51]  *Id.*
[52] *Id.*

reliability of his opinions, not their correctness, and also keeping in mind that Plaintiff has the burden of proof for admitting the opinions.

To analyze his opinions, the Court will use the factors described in the *Daubert* opinion, and then turn to the factors outlined in the Fed. R. Evid. 702 Advisory Committee Notes, and one other test that this Court has found useful in past cases.[53] And finally, the Court will apply the text of Rule 702.   But first the Court notes that the Supreme Court decided *Daubert* in 1993, and that the Eleventh Circuit Court of Appeals has an extensive *Daubert*/Rule 702 jurisprudence.   As a consequence, lawyers have had ample opportunity to understand the Rule 702 requirements, to help their experts write proper Rule 26(a) reports, and to prepare expert witnesses to testify at depositions and at trials.   Of course, the Court recognizes that even the best lawyers cannot always get their experts to cooperate.   The Court begins with the non-exclusive *Daubert* factors or tests.

**The *Daubert* Factors**

The Supreme Court offered four non-exclusive factors to test an expert's opinions: (1) testability, (2) effort rate, (3) peer review and publication, and (4) general

---

[53] *Kumho Tire*, 526 U.S. at 150-52.

acceptance.[54]   The Court finds nothing in Dr. Sachy's deposition to support any of these factors.   That, however, is not fatal to Dr. Sachy's opinions on 1 through 3; rather, he could have bolstered his opinions had he given the Court a basis for satisfying these factors. That he failed to do so is not serious in a case like this that does not involve strict scientific evidence.

On the other hand, failing the general acceptance factor is important.   For many of his diagnostic opinions that lie outside his area of practice and training, Dr. Sachy has not shown that doctors who do practice in the field generally accept his opinions.   This is true about his opinions in the fields of radiology and neuroradiology—especially his opinions about Plaintiff's March 2014 MRI, which is very important for Plaintiff's damage claims.

For example, he claims that the radiologists who read the March 2012 study "missed [it]"—missed the fact that the scan showed that Plaintiff has brain atrophy, which Dr. Sachy does diagnose.[55]   Yet, he has not explained why his opinion about the MRI is generally accepted or why the radiologist's contrary opinion is not generally accepted.

---

[54] *Daubert*, 509 U.S. at 593-95.
[55] Dr. Sachy Dep., [Doc. 34] at p. 126.

And Dr. Sachy fails a second time on this factor. He says that withholding Plaintiff's drugs at MSP violated the standard of medical care and amounted to deliberate indifference to Plaintiff's serious medical needs, but he has not shown that the medical community generally accepts that opinion. In fact, Plaintiff's other expert, Dr. Herrington, does not agree. He testified that he did not question withholding the drugs; he thought Plaintiff should have been monitored.[56] So, on the fourth *Daubert* factor, Dr. Sachy has a major failure, which the Court will describe in more detail below.

**The Advisory Committee Factors**

In the next step of the analysis, the Court applies the five factors found in the Advisory Committee Notes.[57] The Court will apply them one at a time.

Underline First, whether the expert is proposing to testify about matters growing naturally and directly out of research he has conducted independent of the litigation, or whether he has developed his opinion expressly for purposes of testifying.

Dr. Sachy developed his liability and causation opinions for purposes of testifying. He did no research, despite the fact that he testified that he planned to do research to support his opinions before he testified at trial. Moreover, he did not reach his opinions independently of the litigation. The Court has always understood that this

---

[56] Dr. Herrington Dep., [Doc. 31] at p. 44, 59-60.
[57] Fed. R. Evid. 702 advisory committee's note (2000 amendments).

first factor implies that opinions reached outside the litigation context are more reliable than those devised for the case, so Dr. Sachy fails this test. The Court, however, does not find this factor very significant standing alone.

Second, whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion.

The key accepted premise in this case is that benzodiazepine withdrawals can cause serious injury and even death. The Court does not doubt this. But from this premise Dr. Sachy draws too many unfounded conclusions about Plaintiff's injuries. Dr. Sachy wants to blame most of Plaintiff's current problems on the incident at MSP. As the Court will show below, he draws unfounded conclusions because he does not have the requisite skill and training to give such opinions and because he lacks good data and a reliable methodology.

Also, that benzodiazepine withdrawals raise grave medical problems does not lead to the conclusion that the only way to treat those withdrawals is by continuing to medicate Plaintiff with Xanax or taper the drug. This goes back to the general acceptance problem, and Dr. Sachy fails this test.

Third, whether the expert has adequately accounted for obvious alternative explanations.

Dr. Sachy also fails this factor.   He does not have enough understanding of the record to account for obvious alternative explanations, especially about Dr. Fitz-Henley's and Dr. Fye's explanation for the way they cared for Plaintiff.   Although Plaintiff's counsel deposed Dr. Fye well before Dr. Sachy's deposition, Dr. Dr. Sachy never read that deposition to learn the facts and circumstances of his care.   Also, he has not looked at the medical record.   Furthermore, he does not know what happened to Plaintiff at MSP, so he can't address alternate theories about the incident.

Next, a state court judge obviously thought that Plaintiff needed drug treatment, and he failed to complete it.   Dr. Sachy prescribed him large doses of drugs known to have severe side effects, but especially the side effects of benzodiazepine and opiate addiction. It is an important question about which of his injuries or symptoms that allegedly arose at MSP were caused by what happened there versus his long-standing drug side effects and addictions. Indeed, he was still taking high doses of benzodiazepines and opiates at the time of his deposition.[58] This matters on Plaintiff's damages claim because the *Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition* describes Opioid Use Disorder and Anxiolytic Intoxication, and both disorders

---

[58] *See* Pl.'s Dep., [Doc. 33] at p. 119. At the time of his deposition, Sachy had him on Xanax, and two opiates, Fentanyl and Oxycodone. *Id.*

have signs and symptoms that Plaintiff experienced before and after the incident at MSP.[59]

Furthermore, he had a history of alcohol abuse, cocaine abuse, PCP abuse, and marijuana abuse.[60]   In fact, he said in an October of 2012 visit to River Edge Behavioral Health that "I feel different but not better; didn't realized how clearer things would be when sober, I'm feeling a lot steadier."[61]  Dr. Sachy does not adequately differentiate the serious problems Plaintiff had before the incident at MSP versus what happened there. He has also not distinguished what side effects his ongoing use of benzodiazepines, oxycodone, and fentanyl causes.

Likewise, Plaintiff suffered three seizures, and Dr. Sachy does not explain how he can distinguish the effects of one seizure over the other or the cumulative effects of the three versus what happened at MSP on February 14, 2013. For example, the seizure that occurred in September of 2012 required hospitalization.[62] In fact, in a letter Plaintiff wrote to Jean Boone at River Edge about this earlier seizure, he said:

> Things did not turn out well & the consequences of their having turned out so terribly badly, I will have to deal with daily for the rest of my life. I had a grand mal seizure (tonic clonic) and developed blood clots. . . my life has forever been altered. Words cannot express how dismaying and

---

[59] APA, *Diagnostics and Statistical Manual of Mental Disorders*, 5th Ed., 541, 556 (2013).
[60] Pl.'s Medical Chronology, [Doc. 52] at p. 32.
[61] *Id*. at p. 34.
[62] *Id*. at p. 31.

distressing it is to know I was ordered to do something that nearly cost me my life, twice, and on-going.[63]

This sounds like what Plaintiff has said about his medical problems that arose because of what happened at MSP, so this is an important causation issue.

Also, Dr. Sachy does not account for how monitoring Plaintiff's drug withdrawals, which is Dr. Herrington's opinion, rather than either continuing the drugs or tapering him off them, which is Dr. Sachy's opinion, is not acceptable medical care.[64]

But Dr. Sachy does account for one obvious alternative.  He ably defends his years of treating Plaintiff's symptoms with opiates, benzodiazepines, and psychotropic drugs.[65] He understood that the amount of drugs he prescribed Plaintiff was controversial.[66] Furthermore, Plaintiff was admitted to River Edge Behavioral Health in September of 2012 for drug treatment to detox him off the drugs Dr. Sachy prescribed for him—Xanax and oxycodone.[67]  The amount of drugs he prescribed Plaintiff is significant and can cause significant side effects. This implicates the damages/causation

---

[63] *Id*. at p. 41.

[64]  Dr. Herrington Dep., [Doc. 31] at p. 44. Dr. Herrington testified that monitoring was what was required and did not say that he should have been continued on his Xanax. *Id*. at 44.

[65]  *See* Dr. Sachy Dep., [Doc. 34] at p. 10-15, 37-42, 69-72, 157-63.   As Dr. Sachy said: "You know, patients need to be treated humanely, and not the blame put on their medicine or the doctor who is writing it." *Id.* (emphasis added).

[66]  *See id.* at 175.

[67]  Pl. Medical Chronology, [Doc. 52] at p. 27.

issue in this case. This one alternate explanation, however, is not enough to counterbalance his other failures on this factor, so he fails this test.

Fourth, whether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting.

Dr. Sachy fails this factor. In his deposition he describes all the care that he exercises in treating his patients. He also testifies about what he would do to prepare to testify at trial—in other words, what he has not done for this case. Consequently, he has not been as careful in preparing his opinions in this case as he customarily is in his medical practice; or what, by his own standards, should be done in preparing for trial.[68] In fact, he has been sloppy and offered broad generalizations, not focused opinions; consequently, he has not shown "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."[69]

Fifth, whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give.

Psychiatrists are known to reach reliable results about the use of benzodiazepine, opiates and various psychotropic drugs and the uses, benefits, and side effects of such drugs. They also understand benzodiazepine and opiate withdrawals and the wide

---

[68] Dr. Sachy Dep., [Doc. 34] at p. 30, 33, 51, 241-42.
[69] *Kuhmo*, 119 S.Ct. at 1176.

spectrum of psychiatric illnesses. Psychiatrists, however, are not normally known to interpret and make diagnoses based on MRI scans, CT scans or other radiological techniques. A psychiatrist by definition is not a neurosurgeon, orthopedic surgeon, neuropsychologist, otolaryngologist, or family practitioner and psychiatrists are not known to reach reliable results in the fields in which they don't practice. Dr. Sachy has given important opinions that are within the province of other medical specialties, so they cannot be admitted. The Court has already described some of his out-of-specialty opinions and will describe them further in the rest of this order. He fails this test for all out-of-specialty opinions, but of course, this ruling is in conjunction with all the other findings in this order.

<u>The Court's Test</u>

This Court has used another test in medical cases that helps analyze the reliability of expert opinions. The test considers what experts normally do in preparing opinions for and testifying in cases against doctors.   The Court has had considerable practice in this arena.[70]

As the Court has shown, Dr. Sachy has not reviewed essential records. Also, he has done no medical research.   Defense counsel on deposition asked him if he intended

---

[70] *See Medical Torts in Georgia: a Handbook on State and Federal* by C. Ashley Royal and Preyesh K. Maniklal, Thomson Reuters, (2015-2016 Edition).

to do research before trial Dr. Sachy said: "Oh, I do. If this goes to trial, you bet I do." He went on to say that "I haven't looked up anything yet."[71] Hence, Dr. Sachy admits the importance of reviewing medical literature and his failure to do it.[72]   But the Court finds more serious problems here.

Defense counsel asked him if he held opinions that Dr. Fitz-Henley and Dr. Fye violated the standard of care. He answered: "On that, I've not reviewed their stuff, because I've not had stuff to look at or that I can remember. If that's in the paperwork you've been given, it's there, but it's not in my memory bank. I can just tell you, I don't know anything about these doctors . . . . I'll just tell you. It is not them in person per person that I'm thinking now. It's just the State failed, or whoever failed to ensure that this man had his Constitutionally-guaranteed right to appropriate medical when he goes to trial."[73]   Again, these are general conclusions not focused opinions.

Experts in medical cases commonly read the medical records and always have an understanding of what the defendant doctor did or failed to do.   Dr. Sachy ignored the essentials because he did neither.   He failed to use proper data.   Consequently, he doesn't have the fundamental facts to apply a reliable method, so he fails this test.

---

[71] Dr. Sachy's Dep., [Doc. 34] at p. 30.

[72] *Id.*

[73] *Id.* at 42.

Thus, that ends the Court's analysis using the Advisory Committee Notes factors and the Court's additional test.

Having found many failures at this stage of the analysis, the Court could exclude his opinions, but the Court will now move to the Rule 702 requirements to describe Dr. Sachy's failures in more detail.

The Elements of Fed. R. Evid. 702

Rule 702 controls how district court judges admit expert opinions, so the Court will now consider those requirements. First, to give expert opinions, a witness must be qualified based on knowledge, skill, experience, training, or education. Dr. Sachy is a psychiatrist; he is not a dentist, radiologist, neuro-radiologist, otolaryngologist, neurosurgeon, or orthopedic surgeon, yet he frequently offers opinions outside of the field of psychiatry and pain management.  More specifically, he is not a dentist, so cannot testify about Plaintiff's dental condition or any cause of that condition.   He is not a radiologist, orthopedic surgeon, or neurosurgeon, so he cannot testify about the condition of Plaintiff's lumbar spine other than that it causes Plaintiff pain.[74]  Those subspecialists routinely diagnose and/or treat lumbar spine problems in their practice. Psychiatrists do not.   And although pain doctors may treat spine pain, they don't treat

---

[74] *See id.* at p. 22.

the underlying spinal pathology like neurosurgeons and or orthopedists do. Furthermore, Dr. Sachy cannot say that Plaintiff injured his back more at MSP, and he could not say that because he has not fully reviewed the jail records.[75]

Dr. Sachy's biggest qualification problem arises from his reading of the already discussed MRI scan of Plaintiff's brain taken 13 months after the incident at MSP. The Court finds nothing in his resume or his deposition that shows him qualified to read such films other than his own *ipse dixit* about his qualifications.[76] (Notably, during his deposition he was shown an exhibit, and he was not sure if it was a CT Scan or an MRI.[77]) The Court's gatekeeping role requires more than just taking the witness's word for something.[78] Radiology residency programs and neuroradiology residency training require years of training after medical school to develop the clinical skills needed to read X-Rays, CT Scans, and MRI Scans, and make diagnoses based on those readings. Neurosurgeons operate on brains, so they are trained to read brain MRI's. Dr. Sachy has none of that extensive training.

But a lay jury may not understand that medical school takes four years followed by internships, residencies, fellowships, board certifications, and the high degree of

---

[75] *See* Dr. Sachy Dep., [Doc. 34] at p. 27.

[76] The *ipse dixit* of the expert is inadequate to support an opinion. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 140 (1997).

[77] *See* Dr. Sachy Dep., [Doc. 34] at p. 22.

[78] *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1319 (9th Cir. 1995).

specialization that is common in the medical practice in America. For example, the Duke University Radiology Department website says that it offers a 3/2 radiology residency. In other words the residency lasts five years.   The neuroradiology fellowship lasts one year for a total of six years.   Again, Dr. Sachy has none of this training. Moreover, what he said in his deposition about the MRI scan further undermines his credentials pretensions.

Contrary to his opinion about the March 2014 MRI scan, he volunteered that "I'm sure you'll find an Expert to say—a neuro-radiologist to say it's totally normal."[79]   In fact, he admits he is the only psychiatrist who reads MRI Scans.[80]  Dr. Sachy tests the Court's credulity here.   But he further undercuts his opinions about Plaintiff's cognitive impairment when he testified that Plaintiff should have "a full neuropsychological evaluation in this case to illuminate more clearly than I can the cognitive deficits he now has, and the psychiatric sequella he has from his most recent traumatic event."[81]   In other words, he thinks Plaintiff should go to a real expert in the area of brain injury to find out what is wrong with him.

---

[79] Dr. Sachy Dep., [Doc. 34] at p. 134.
[80] *Id.* at p. 139.
[81] *Id.* at p. 15.

As a careful reading of his deposition shows, Dr. Sachy is a self-described expert in several fields, fields of complex medical sub-specialization after medical school, that require years of training and call for board-certification. He has none of that outside of psychiatry.

The danger, however, is that a jury will accept Dr. Sachy's "neuroradilogist" opinions about the March 2014 MRI based on his claimed OJT without recognizing the complexities and nuances of reading MRI scans.   Cross-examination is inadequate here; the Court must bar his opinions about the MRI, which also bars him from testifying that Plaintiff suffered brain damage and cognitive dysfunction as a result of the incident at MSP.

Thus, Dr. Sachy's qualifications limit his testimony to matters of psychiatry and pain management. The Court believes that these qualifications include dealing with benzodiazepine withdrawals, for example, if he can otherwise satisfy the other Rule 702 requirements.

Next, Rule 702(a) requires that the expert's opinions "help the trier of fact to understand the evidence or to determine a fact in issue."[82]   Dr. Sachy's opinions about medical negligence and deliberate indifference fail this element because he does not

---

[82] Fed. R. Evi. 702(1).

know enough about the record to say what Dr. Fitz-Henley did or failed to do in treating Plaintiff.  Saying that the "staff" should not have taken Plaintiff off his drugs is not good enough; he must be specific about who did what and why it was wrong.  This is especially true in prison cases where there are layers of authority, institutional rules and practices, and the division of duties and responsibilities.  A prison is a bureaucracy not a doctor's office or a surgical suite.  Consequently, his opinions about Dr. Fitz-Henley violating the standard of care or being deliberately indifferent do not assist the jury and are not admissible.

But Dr. Sachy's failures go deeper.  First, nowhere in Dr. Sachy's letter or his deposition does he mention Dr. Fitz-Henley's or Dr. Fye's name or the name of any other prison employee or agent who had a duty to Plaintiff.  Likewise, he does not specify any act or omission attributable to any defendant who had any duty to Plaintiff because he has not reviewed the record.  In fact, he does not know how Dr. Fitz-Henley was involved in Plaintiff's care.  Defense counsel asked Dr. Sachy: "Do you know how Fitz-Henley was involved in this case;" and he answered, "Not off the top of my head."[83] These are important failures as a matter of law.

---

[83] Dr. Sachy Dep., [Doc. 34] at p. 7.

Georgia courts have long held that the standard of care question in a medical malpractice case is determined "under similar conditions and like surrounding circumstances … ordinarily employed by the medical profession generally." [84] Moreover, an Eighth Amendment deliberate indifference claim has a subjective component, and Dr. Sachy does not know what Dr. Fitz-Henley knew about Plaintiff.[85] Consequently, Dr. Sachy does not know the conditions and circumstances surrounding Dr. Fritz-Henley's care or lack of care when he saw Plaintiff on February 12, 2013, so his opinion is inadmissible.   He not only lacks knowledge of important facts and data, his opinions do not assist the jury on either theory because he knows so little about what happened to Plaintiff at MSP.[86]

Next, Rule 702(b) requires Dr. Sachy to base his opinions on sufficient facts or data. The Court finds a singular failure on Dr. Sachy's part here.   As explained in detail, he did not review the medical records or the institutional records, he did not read any of the depositions, and he did not research any medical literature.   Also, he did not review

---

[84]  *Hayes v. Brown*, 108 Ga.App. 360, 363, 133 S.E.2d 102, 104-05 (1963).

[85]  *Hill v. DeKalb Regional Youth Detention Center*, 40 F.3d 1176, 1186 (11th Cir. 1994) *overruled in part on other grounds by Hope v. Pelzer*, 536 U.S. 730, 739 (2002)).

[86]  *See Allison*, 184 F.3d at 1311-12 ("The judge's role is to keep unreliable and irrelevant information from the jury because of its inability to assist in factual determinations, its potential to create confusion, and its lack of probative value."); *see also Quiet Tech. DC-8, Inc.*, 326 F.3d at 1347.

any MSP policies or protocols.[87]   In fact, Dr. Sachy describes in several places in his deposition what he plans to do to prepare for trial, which, of course, he should have done for his deposition.   Here is an example regarding Plaintiff's back problems, which Dr. Sachy treated with opiates, and he is talking about the medical record: "I'm not sure, because I would have to fully review the jail records, which again I think I got some, but I gave them to the mom, but I don't know if I got them all. It seemed like there were records that were being sent to me that no one could get at that time, but I'll wait on that until I—you know, I know I've said Expert here.   I didn't prepare that way for this, even though you asked me about that now, about I will certainly, if the back is an issue, I will review those records."[88]

Furthermore, Dr. Sachy does not know what happened with Plaintiff's medications at MSP.[89]   Indeed, on this issue he said: "Again, I'd have to review what other meds were added and discontinued at that time, because I can't remember. And I'm sorry about that, because I really didn't think about this Expert thing here."[90]  So, as noted above, Dr. Sachy has not reviewed critical records in this case.

---

[87]  Dr. Sachy Dep., [Doc. 34] at p. 92-93.
[88]  *Id*. at p. 27-28.
[89]  *Id*. at p. 53.
[90]  *Id*.

Next on the data requirement, Dr. Sachy said in his letter that Plaintiff had at least one major seizure at MSP. Yet in his deposition, he said: "Now, I don't know if he had a seizure."[91] Rule 702 does not allow Dr. Sachy a warm-up deposition.   His preparation for offering opinions and testifying at trial are far outside the bounds of what experts normally do in cases like this one.   His data failures are severe and cannot be overcome by talking to Plaintiff after the incident or Plaintiff's mother who was not at the prison. If benzodiazepine withdrawals are as dramatic and dangerous as Dr. Sachy says they are, it is difficult to understand how Plaintiff can be a reliable witness or provide reliable information about most of what happened at MSP between February 12th and February 14th at MSP, and Plaintiff's deposition proves this.

For example, he did not remember Dr. Fitz-Henley.[92]   Also, he doesn't remember the seizure.[93]   He explained that grand mal seizures make you fuzzy for a while afterwards.[94]   "It really is kind of a blur," he said referring to what happened at MSP.[95] Moreover, he testified that he had hallucinations leading up to the event on February 14 and did not know what happened when he had a seizure.[96]

---

[91] *Id.* at 110.
[92] Pl. Dep., [Doc. 33] at p. 89.
[93] *Id.* at 77.
[94] *Id.* at 65.
[95] *Id.* at 77.
[96] *Id.* at 65; *see* Fed. R. Evi. 703. The Court does not believe that Dr. Sachy can "reasonably rely" on

But the data problem goes deeper and not just on the liability feature of the case but also the injury claims. As explained above, Dr. Sachy relies heavily on the MRI scan that was taken 13 months after the incident, but he has no baseline MRI from before the incident to compare to the second MRI to see what, if any, changes occurred. No baseline MRI is especially problematic in this case because, as already described, Plaintiff had a seizure in September 2012.   He also had another seizure in Dr. Sachy's office.[97] Importantly, Dr. Sachy explained that every seizure causes brain damage. This is problematic because Dr. Sachy contends that Plaintiff's seizure at MSP caused his brain damage, even though the others had to contribute to it, according to Dr. Sachy's own testimony. But again, on the seizure/brain damage opinion, he showed his failure to have the proper data.   Although he knew that Plaintiff had suffered an earlier seizure, he had not reviewed those medical records either.   And as he explained about those records, if "the records indicated something different, I will change my mind."[98]   Dr. Sachy has failed to review enough medical records to apportion the damage from one seizure to another. In fact, this may not even be possible.

---

Plaintiff's statements about what happened at MSP.
[97] Margaret Stoner Dep., [Doc. 42-4] at p. 86-87.
[98] Dr. Sachy Dep., [Doc. 34] at p. 51.

Next, Rule 702(c) requires that experts' opinions must be a product of reliable principles and methods.   Dr. Sachy fails again.   As outlined above, he bases many of his opinions on training and skills outside his field of practice.   His method relies on woefully inadequate data.   He fails to draw conclusions about what any doctor actually did or failed to do for Plaintiff.   He has done no research, and he has failed to consider important medical records.

The final Rule 702 element, 702(d), requires that the expert reliably apply the principles and methods to the facts of the case.

The Court can add nothing new here.   Dr. Sachy applied an unreliable method to insufficient data and created inadmissible opinions.   He is a proud example of an underpreparing and over testifying expert witness.

In *Daubert* the Supreme Court said that in shaky cases cross-examination should serve as the means to challenge the expert's opinion.[99]   First, this is not a shaky case. But second, and more important, there is too much to cross examine this expert about to submit his testimony to the jury.   But it is not just a volume problem; it is also a problem about the complexity of broad-ranging medical issues and the side effects of powerful and life-threatening drugs.   Furthermore, on the causation issue, Dr. Sachy has done

---

[99] 509 U.S. at 596.

little more than argue the *post hoc ergo propter hoc* fallacy—it happened after therefore it was caused by. This is an argument based on nothing but temporal sequence, and it does not authorize admissible opinions.[100] Unfortunately, this kind of argument has broad jury appeal. The power of its appeal is shown by how often American politicians use it to sway public opinion.

To summarize what the Court has excluded, Dr. Sachy cannot testify that Plaintiff suffered brain damage or brain injury or cognitive loss or decline because of what happened at MSP. He is not an otolaryngologist, so he cannot testify that Plaintiff has hearing loss or hypersensitivity to auditory stimuli. (He has not tested Plaintiff for such loss.) He cannot testify that Plaintiff injured his back at MSP. He cannot testify that he needs the regular care of a neuropsychologist, a neurosurgeon, dentist, or primary care physician. Perhaps the Court has overlooked some of his causation opinions that should be excluded, and if so, the Court will deal with those at the pretrial conference.

Likewise, he cannot offer standard of care testimony in this case. He cannot testify that Dr. Fitz-Henley failed to exercise the medical standard of care, or that he was deliberately indifferent to Plaintiff's serious medical needs or any of the other broad generalizations about liability issues.

---

[100] *McClain v. Metabolife Int'l, Inc,* 401 F.3d 1233, 1243 (11th Cir. 2005).

To summarize the Court's summary: Dr. Sachy can't testify as the be-all-and-end-all global damages expert for plaintiff, and he can't be a standard of care expert witness either.

## Part 2. FAILURE TO SATISFY FEDERAL RULE OF CIVIL PROCEDURE 26(a) REQUIREMENTS FOR DR. SACHY'S OPINIONS

The Court finds many Rule 26(a)(2) failures in the required report, which Dr. Sachy's deposition only exacerbates.  First, a party offering an expert must submit a written report "prepared and signed by the witness."[101]   It appears in this case that Plaintiff's counsel prepared the Rule 26 report, not Dr. Sachy, and he obviously did not sign it.   Indeed, Dr. Sachy did not know that Plaintiff's counsel had identified him as an expert witness until after his deposition began.[102]   Next, Rule 26(a)(2)(B)(i) requires a complete statement of all opinions and the basis and reasons for them. The Court finds a dismal failure of this duty in Dr. Sachy's report and also in his deposition.   Next, Rule 26(a)(2)(B)(ii) requires the witness to describe the facts and data upon which he formed or based the opinions, but Dr. Sachy failed here too.   Next, Rule 26(a)(2)(B)(v) requires a list of other cases in the past four years in which the witness has served as an expert at trial or by deposition.   Dr. Sachy did not provide this information in the report or in his

---

[101] Fed. R. Civ. P. 26(a).

[102] Dr. Sachy Dep., [Doc. 34] at p. 13.   When asked when he became aware of being an expert he said: "I think right now; I mean, unless I've been made aware before, and just was not thinking about it. I can't remember. I can certainly testify expertly in this case." *Id.*

deposition. This is all very important information and clearly required, so these very important failures substantially prejudice the defense.

The Advisory Committee Report Notes to Rule 26(a) explain the importance of complying with these discovery requirements. Regarding Rule 26(a)(2) Disclosure of Expert Testimony the Notes explain: "This paragraph imposes an additional duty to disclose information regarding expert testimony sufficiently in advance of trial that opposing parties have a reasonable opportunity to prepare for effective cross examination and perhaps arrange for expert testimony from other witnesses."[103]   Dr. Sachy has woefully failed to give defense counsel the opportunity to prepare an effective cross-examination for some of the reasons stated in Part 1 of the order.

Moreover, Fed. R. Civ. Proc. 37(c)(1), *Failure to Disclose or Supplement*, applies in this case. It says that, "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."[104]   This provision allows the Court to impose sanctions. Excluding an expert's opinions is one of the sanctions.[105]

---

[103] Advisory Committee Notes (1993 amendments).
[104] Fed. R. Civ. P. 37(c)(1).
[105] *See, .e.g., Mee Ind. V. Dow Chemical Co.*, 608 F.3d 1202, 1221-22 (11th Cir. 2010) ("The district court did not abuse its discretion in concluding disclosure was required under Rule 26 and that Mee's failure to meet the

As a consequence of the failure to satisfy the Rule 26(a) reporting requirements and the failure to overcome those failures in Dr. Sachy's deposition, indeed, to even exacerbate those failures, the Court excludes his expert opinions.

Finally, this is only a preliminary not a final ruling. The Court recognizes that under Rule 37(c), Plaintiff's counsel has the opportunity to be heard on the Court's ruling, and the Court will afford that opportunity by scheduling a hearing. The Court believes that proceeding in this way benefits Plaintiff's counsel because he knows beforehand the Court's concerns and can specifically address them. If he can show substantial justification for these failures, the Court will amend this part of the order. The Court will also consider any arguments that such failures are only harmless error.

Now, having ruled out Dr. Sachy's expert opinions, the Court notes that Plaintiff has other avenues open to describe the injuries he suffered at MSP. Although he cannot make any diagnoses of his injuries, he can explain his before and after problems. Likewise, his mother can offer lay opinions under Fed. Evid. R. 701 about his before and after condition assuming that she can satisfy the proper foundation.

---

Rule 26 requirements was not substantially justified or harmless."); *Mitchell v. Ford Motor Co.*, 318 F. App'x 821, 824 (11th Cir. 2009) (per curiam) (holding the district court did not abuse its discretion by striking the expert's testimony for failure to follow the Rule 26 requirements).

Further, Dr. Sachy is Plaintiff's treating physician, even though he has been named as an expert witness in this case. Because he is a treating physician, the Court will allow Dr. Sachy to testify that Plaintiff suffers from Post Traumatic Stress Disorder ("PTSD") because of what happened at MSP. He is a psychiatrist, and PTSD is a standard psychiatric diagnosis found in the DSM-V. Plaintiff can testify that he suffered trauma at MSP, and by history Dr. Sachy can offer the opinion that he has PTSD. He can also testify about the symptoms associated with PTSD.

The Court will allow this testimony but only with great trepidation about how the Court can keep Dr. Sachy under control at trial. He cannot use this opportunity to backdoor any of his opinions the Court has excluded. Having said this, however, the Court notes that being a treating physician does not excuse expert opinions from the Rule 702 requirements. It only excludes them from the Fed. R. Civ. Proc. 26(a) notice requirements.   The Court will deal with these matters at the pretrial conference.


**SO ORDERED**, this 31st day of March, 2017.


S/ C. Ashley Royal
C. ASHLEY ROYAL, SENIOR JUDGE
UNITED STATES DISTRICT COURT