IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | | |
|---|---|---|
| WILLIAM STONER, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | No. 5:15-CV-102 (CAR) |
| CHIQUITA A. FYE, M.D., | : | |
| NORMAN HOWARD FITZ- | : | |
| HENLEY, M.D., | : | |
| | : | |
| | : | |
| Defendants. | : | |
| | : | |

## ORDER ON DR. FYE'S MOTION TO EXCLUDE
## THE REPORT AND TESTIMONY OF DR. HERRINGTON

Before the Court is Defendant Chiquita A. Fye, M.D.'s Motion to Exclude the
Report and Testimony of Ryan D. Herrington, M.D. [Doc. 40]. Dr. Herrington is one of
Plaintiff's two experts. The Court has reviewed the parties' briefs, discussed the legal
issues and fact questions with the lawyers by telephone, and allowed the parties the
opportunity to supplement the record. After reviewing the briefs, the expert's
deposition, and having considered the applicable law, the Court **DENIES** Dr. Fye's
Motion to Exclude the Report and Testimony of Dr. Herrington [Doc. 40].

**BACKGROUND**

In this case, Plaintiff William Stoner brings deliberate indifference claims pursuant to 42 U.S.C. § 1983, as well as Georgia state law medical malpractice claims against Defendants Dr. Norman Howard Fitz-Henley and Dr. Chiquita A. Fye. While incarcerated at Macon State Prison, Plaintiff contends Defendants violated his Eighth Amendment rights by failing to acknowledge his medical complaints and withdrawal symptoms, review his medical records, or take any action despite knowing his risk of seizures from withdrawal of his prescribed medications. As a result, Plaintiff complains he suffered severe and permanent injuries. The Court will first summarize the pertinent facts before addressing Defendant Dr. Fye's Motion to Exclude Plaintiff's expert.

On February 11, 2013, Plaintiff arrived at Baldwin County Jail to serve his 60-day sentence and was transported to Bleckley Probation and Detention Center. After Plaintiff underwent an initial health and diagnostics screening, the physician ordered Plaintiff to be transferred to a facility with 24-hour nursing care due to risk of withdrawals from his medication. Plaintiff suffered from degenerative disc disease, panic attacks, and blood clots, and was taking Xanax, Oxycodone, and Coumadin. Plaintiff also recently experienced a seizure after being removed from his prescription medications.

On the evening of February 11, 2013, Plaintiff was transferred to Macon State Prison ("MSP") and placed in administrative segregation. On February 12, 2013, Dr. Fitz-Henley and several nurses met with Plaintiff. On February 13, 2013, Plaintiff's mother, Margaret Stoner, spoke with the Medical Director, Dr. Fye, and informed her Plaintiff was taking Oxycodone, Xanax, and Coumadin and would have a seizure if he did not receive his medication. Dr. Fye reviewed Plaintiff's medical records, but she did not examine or assess Plaintiff's condition in person.

The next morning, on February 14, 2013, Plaintiff was found on the floor of his cell unresponsive, incontinent of bowl and bladder, and with labored breathing. Dr. Fye assessed Plaintiff as having possible withdrawals from his medications. Plaintiff was transferred to Flint River Hospital and then airlifted to the Medical Center of Central Georgia. Plaintiff alleges the complete withdrawal of benzodiazepine caused him to have a seizure and resulted in significant physical and psychological injuries, including brain damage, memory loss, post-traumatic stress disorder, cognitive decline, and has lost teeth.

After filing suit, Plaintiff engaged Dr. Herrington and Dr. Sachy as experts. On March 31, 2017, the Court denied Defendants Dr. Fye and Dr. Fitz-Henley's Motions for Summary Judgment, and granted Dr. Fitz-Henley's Motion to Exclude Dr. Sachy. Now, Dr. Fye has filed a Motion to Exclude Dr. Herrington's Expert Report and Testimony.

## LEGAL STANDARD

Federal Rule of Evidence 702 governs the admissibility of expert testimony, and

it states:

> A witness who is qualified as an expert by knowledge, skill, experience,
> training, or education may testify in the form of an opinion or otherwise
> if: (a) the expert's scientific, technical, or other specialized knowledge will
> help the trier of fact to understand the evidence or to determine a fact in
> issue; (b) the testimony is based on sufficient facts or data; (c) the
> testimony is the product of reliable principles and methods; and (d) the
> expert has reliably applied the principles and methods to the facts of the
> case.[1]

Simply stated, under Rule 702, the trial court can admit relevant expert testimony only

if it finds that: (1) the expert is qualified to testify about the matters he intends to

address; (2) the methodology used by the expert to reach his conclusions is sufficiently

reliable; and (3) the expert's testimony will assist the trier of fact, through the

application of scientific, technical, or specialized expertise, to understand the evidence

or determine a fact in issue.[2]

As the Supreme Court explained in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*,[3]

Rule 702 imposes a duty on trial courts to act as "gatekeepers" to ensure that

---

[1] Fed. R. Evid. 702.

[2] *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1257 (11th Cir. 2002) (citing *Maiz v. Virani*, 253 F.3d 641, 664 (11th Cir. 2001)); *J & V Dev., Inc. v. Athens-Clarke Cnty.*, 387 F.Supp.2d 1214, 1223 (M.D. Ga. 2005).

[3] 509 U.S. 579 (1993).

speculative and unreliable opinions do not reach the jury.[4]  Acting as a gatekeeper, the trial court must make certain that expert witnesses employ in the courtroom the "same level of intellectual rigor that characterizes the practice of an expert in the relevant field."[5] The court's gatekeeping role is especially significant, since "the expert's opinion can be both powerful and quite misleading because of the difficulty in evaluating it."[6]

To fulfill its role, the trial court must determine whether the expert has the requisite qualifications to offer his or her opinions.[7]  The trial court must also "'conduct an exacting analysis' of the <u>foundations</u> of expert opinions to ensure they meet the standards for admissibility under Rule 702."[8]  Finally, the court must ensure the relevancy of expert testimony, meaning that it must determine whether the testimony will assist the trier of fact.[9] In undertaking this analysis, the court must remember that the party offering the expert opinions has the burden of proof by a preponderance of the evidence.[10]

The court performs its gatekeeping role consistent with Rule 104(a), which commits preliminary evidentiary questions to the court's decision and which further

---

[4] *Id.* at 589, n.7; *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1237 (11th Cir. 2005).

[5] *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999); *see also Goebel v. Denver & Rio Grande W. R.R. Co.*, 346 F.3d 987, 992 (10th Cir. 2003).

[6] *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (quoting *Daubert*, 509 U.S. at 595) (internal quotations omitted).

[7] *Poulis-Minott v. Smith*, 388 F.3d 354, 359 (1st Cir. 2004); *see also Frazier*, 387 F.3d at 1260.

[8] *Frazier*, 387 F.3d at 1260 (quoting *McCorvey*, 298 F.3d at 1257) (emphasis in original).

[9] *See Daubert*, 509 U.S. at 591.

[10] *Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1312 (11th Cir. 1999)

empowers courts in answering these questions to rely on evidence without being constrained by the rules of evidence.[11] In sum, in acting as a gatekeeper, the court must keep "unreliable and irrelevant information from the jury because of its inability to assist in factual determinations, its potential to create confusion, and its lack of probative value."[12] Although *Daubert* involved scientific experts, the Supreme Court has made it clear that the strictures of Rule 702 and *Daubert* apply with equal force to non-scientific expert witnesses.[13] Also, in all cases the proponent of the expert witness bears the burden of establishing that the expert's testimony satisfies the qualification, reliability, and helpfulness requirements of Rule 702 and *Daubert*.[14] Finally, "any step that renders the analysis unreliable renders the expert's testimony inadmissible."[15]

Beginning with the qualification requirement, the Eleventh Circuit has explained that "experts may be qualified in various ways."[16] Certainly, an expert's scientific training or education may provide one means by which an expert may qualify to give certain testimony; however, experience in a particular field may also qualify an expert

---

[11] *McClain*, 592-93 & n.10; Fed. R. Evid. 104(a). In particular, Rule 104(a) provides that "[t]he court must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible. In so deciding, the court is not bound by evidence rules, except those on privilege." Fed.R.Evid. 104(a).

[12] *Allison*, 184 F.3d at 1311-12.

[13] *See Kumho Tire*, 526 U.S. at 147.

[14] *McClain*, 401 F.3d at 1238 & n. 2; *see also Frazier*, 387 F.3d at 1260.

[15] *Goebel*, 346 F.3d at 992 (quoting *Mitchell v. Gencorp, Inc.*, 165 F.3d 778, 782 (10th Cir. 1999)) (internal alterations omitted).

[16] *Frazier*, 387 F.3d at 1260.

to offer an opinion on a particular matter.[17]   Indeed, "experts come in various shapes and sizes," and, consequently, "there is no mechanical checklist for measuring whether an expert is qualified to offer opinion evidence in a particular field."[18]  In all cases, the court must focus its inquiry on whether the expert has the requisite skill, experience, training, and education to offer the testimony he intends to introduce.[19]

Regarding the reliability requirement, the Eleventh Circuit directs trial courts to assess "whether the reasoning or methodology underlying the testimony is . . . valid and whether that reasoning or methodology properly can be applied to the facts in issue."[20] This inquiry must focus "solely on the principles and methodology [of the experts], not on the conclusions that they generate."[21]

*Daubert* offers four non-exclusive factors that courts may consider in evaluating the reliability of an expert's testimony: (1) testability; (2) error rate; (3) peer review and publication; and (4) general acceptance.[22] These four factors most readily apply in cases involving scientific testimony and may offer little help in other cases, particularly those involving non-scientific experts.[23]   Accordingly, these factors merely illustrate rather

---

[17] *Id.* at 1260-61.
[18] *Santos v. Posadas de Puerto Rico Assocs. Inc.*, 452 F.3d 59, 63 (1st Cir. 2006).
[19] *Poulis-Minott*, 388 F.3d at 359.
[20] *Frazier*, 387 F.3d at 1262 (quoting *Daubert*, 509 U.S. at 592-93) (internal alterations omitted).
[21] *Daubert*, 509 U.S. at 595; *see also Goebel*, 346 F.3d at 992.
[22] 509 U.S. at 593-95; *see also J & V Dev., Inc.*, 387 F.Supp.2d at 1224.
[23] *See Kumho Tire*, 526 U.S. at 150-52.

than exhaust the factors or tests available to the trial court. The trial court has

"considerable leeway" in deciding which tests or factors to use to assess the reliability

of an expert's methodology.[24]

The advisory committee's notes for Rule 702 offer an additional list of factors or

tests. These tests are:

(1) Whether the expert is proposing to testify about matters growing naturally and directly out of research he has conducted independent of the litigation, or whether he has developed his opinion expressly for purposes of testifying;

(2) Whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion;

(3) Whether the expert has adequately accounted for obvious alternative explanations;

(4) Whether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting;

(5) Whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give.[25]

Like the four *Daubert* factors, these factors do not comprise a definitive checklist, nor is

any single factor dispositive of reliability; instead, the tests articulated in the advisory

committee's notes merely illustrate the issues a court may consider in evaluating an

expert's testimony.[26]

---

[24] *Id*. at 151-52.

[25] Fed.R.Evid. 702 advisory committee's note (2000 amendments).

[26] *See id.*

Finally, for admission, the expert testimony must assist the trier of fact. Expert testimony assists the trier of fact "if it concerns matters that are beyond the understanding of the average lay person."[27] "[E]xpert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments."[28] Nor does expert testimony help the trier of fact if it fails to "fit" with the facts of the case.[29] Expert testimony lacks "fit" when "a large analytical leap must be made between the facts and the opinion."[30] "A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."[31] Thus, the court may exclude otherwise reliable testimony if it does not have "sufficient bearing on the issue at hand to warrant a determination that it [is 'helpful' to the trier of fact]."[32] At all times when scrutinizing the reliability and relevance of expert testimony, a court must remain mindful of the delicate balance between its role as a gatekeeper and the jury's role as the ultimate fact-finder. A district court's "gatekeeper role . . . is not intended to supplant the adversary system or the role of the jury."[33] "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the

---

[27] *Frazier*, 387 F.3d at 1262.
[28] *Id.* at 1262-63.
[29] *McDowell v. Brown*, 392 F.3d 1283, 1299 (11th Cir. 2004).
[30] *Id.*; *see also General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).
[31] *General Elec.*, 522 U.S. at 146.
[32] *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1234 (10th Cir. 2005).
[33] *Allison*, 184 F.3d at 1311.

burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."[34]  A court may not "evaluate the credibility of opposing experts" or the "persuasiveness of competing scientific studies;"[35] instead, its duty is limited to "ensur[ing] that the fact-finder weighs only sound and reliable evidence."[36]

## DISCUSSION

In this case, Plaintiff's expert, Dr. Herrington, will offer his medical opinion regarding the proper standard of care of a reasonable, prudent correctional facility doctor.[37]  In general, the scope of his opinion is limited to (1) whether the risk of Plaintiff's benzodiazepine withdrawal was properly managed at MSP, and (2) the short-term damage or injury caused by the resulting withdrawal seizure.[38]  Dr. Herrington specifically states the doctors' failures to appreciate the risk of opiate and benzodiazepine withdrawal and to implement a monitoring program is a deviation from the appropriate standard of care that a correctional facility doctor should provide.[39]  However, Dr. Herrington will not offer his medical opinion regarding causation and any permanent or long-term damage the seizure may have caused, or

[34] *Daubert*, 509 U.S. at 596.
[35] *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK, Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003).
[36] *Frazier*, 387 F.3d at 1272.
[37] Dr. Herrington's Dep., [Doc. 31] at p. 28, 60.
[38] *Id.* at p. 29, 45.
[39] *Id.* at p. 44.

whether the decision to discontinue the medication was proper.[40]   Nor will Dr.

Herrington offer any medical opinion about the management of Plaintiff's medications

before his incarceration at MSP.[41]   Thus, Dr. Herrington's expert opinions are limited

here to violations of the proper standard of care a correctional facility doctor should

provide when a prisoner is prescribed benzodiazepines and opiates, and the immediate

resulting damages or injuries from Plaintiff's withdrawal seizure.

Dr. Herrington offers simple opinions based on discreet facts in the record, so the

Court need not do an elaborate analysis to admit those opinions.  The Court finds that

simply applying the Fed. Evid. R. 702 elements will satisfy the Court's duty to act as a

gatekeeper.

First, Dr. Herrington is clearly qualified by his education, training, and

experience to offer his opinions about the standard of care violations in this case

involving medical issues.  He has a medical degree from an excellent medical school,

the University of Virginia.  He had experience working in prison systems when he

served as the Regional Medical Director for the Maine Department of Corrections.  He

also practiced primary care medicine for eight years.  Dr. Herrington has sufficient

knowledge about benzodiazepines and their usage and effects, including their potential

complications, to be qualified to testify.

---

[40] *Id.* at p. 56.
[41] *Id.*

Second, Dr. Herrington's opinions in this case about the failure of medical care in treating or failing to treat Plaintiff will assist the jury. The jury will not likely know about the dramatic effects that can arise from abruptly withdrawing a patient from benzodiazepines and how such withdrawals can threaten the patient's life. Also, the jury will have no idea about the proper medical care required to treat a patient who has been taken off benzodiazepines. These are fundamental issues in the case, and Dr. Herrington's opinion will help them decide those issues.

Third, Dr. Herrington's opinions are based on sufficient facts and data. He reviewed the medical records and relied on those records. Specifically, Dr. Herrington reviewed Plaintiff's prison medical records, as well as the medical records from the Medical Center of Central Georgia. In a case involving medical issues, the medical records offer a fundamental basis for a medical expert to give opinions. His review of those records affords sufficient facts and data to support his opinions.

Fourth, Dr. Herrington bases his opinions on reliable principles and methods. As stated above, in cases involving medical questions about the care a doctor provides a patient, it is fundamental to review the medical records. Dr. Herrington did that in this case. He then took his medical knowledge and experience about treating patients withdrawing from benzodiazepines and applied that to the facts found in the medical record. This is a reliable method.

Fifth, Dr. Herrington reliably applied the principles and method to this particular case because he understood the facts of the care and the involvement of the Defendants in that care.  He also understood Plaintiff's medical condition in issue in the case, and he reached very simple conclusions from that information that were tightly limited to the key questions about the care in this case.

Simple opinions based on simple facts make *Daubert* rulings simple for the Court. Dr. Herrington did what experts commonly do in cases like this, and that is sufficient to satisfy the Rule 702 requirements to admit his opinions.

## CONCLUSION

Accordingly, Defendant's Motion to Exclude the Report and Testimony of Dr. Herrington [Doc. 40] is **DENIED**.

**SO ORDERED,** this 5th day of May, 2017.

S/ C. Ashley Royal
C. ASHLEY ROYAL, SENIOR JUDGE
UNITED STATES DISTRICT COURT